## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| TIMOTHY H. CAHILL, | : | |
| | : | |
| Plaintiff, | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 12-5753 |
| CAROLYN W. COLVIN, | : | |
| Acting Commissioner of Social Security | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM

YOHN, J.                                          August 8, 2013

Plaintiff, Timothy Cahill, initiated this action seeking review of the Social Security

Commissioner's decision to deny his application for Social Security Disability Insurance Benefits

("DIB"). I referred the case to a magistrate judge for a report and recommendation ("RR"), which

issued on June 17, 2013. That same day, Cahill filed his objections thereto. After independent, de

novo review of the RR and plaintiff's objections, I will approve and adopt the report of the

magistrate judge denying plaintiff's request for review and entering judgment in favor of

defendant.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      Administrative Framework

To qualify for DIB, a claimant must have a disability. 42 U.S.C. § 423(a)(1)(E). A

disability means the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than 12

months." *Id.* § 423(d)(1)(A). A person has a disability when the person's "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A). For the Commissioner to find that a person has a disability, the person must "furnish[ ] such medical and other evidence of the existence" of a disability, including "[o]bjective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques." *Id.* § 423(d)(5)(A).

When evaluating a claim for DIB, the Commissioner applies a five-step sequential analysis: (1) whether the claimant worked during the alleged period of disability, (2) whether the claimant has a "severe medically determinable . . . impairment," (3) whether the "impairment" meets the requirements of a listed impairment, (4) whether the claimant can continue to perform "past relevant work," and (5) whether the claimant can perform "other work" in the national economy. 20 C.F.R. § 404.1520(a)(4); *Sykes v. Apfel*, 228 F.3d 259, 262-63 (3d Cir. 2000). The claimant bears the burden of proving steps one through four. If the claimant satisfies these requirements, the burden of production shifts to the Commissioner to show that the claimant is capable of performing "other work." *Sykes*, 228 F.3d at 263; *see also Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999) (noting burden of production shifts to Commissioner at step five).

At the outset of step four, the Commissioner must assess the claimant's residual functional capacity ("RFC"), a measure of what the claimant can do in a work setting despite the claimant's physical and mental limitations. 20 C.F.R § 404.1545(a)(1); *see also Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 201 (3d Cir. 2008). The Commissioner then determines

whether the claimant, in light of his RFC, can perform his "past relevant work"; if he can, then the Commissioner will find him not disabled. 20 C.F.R. § 404.1520(a)(4)(iv).

The fifth step involves a two-part analysis. First, the Commissioner must assess the claimant's present job qualifications based on the claimant's RFC, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(v); *see also Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993) (citing regulations). Next, based on the claimant's qualifications, the Commissioner must identify what jobs exist in the national economy that the claimant can perform. 20 C.F.R. § 404.1520(g); *see also Mason*, 994 F.2d at 1064 (citing regulations). If the claimant can make an adjustment to other work, the Commissioner will find that he is not disabled. 20 C.F.R. § 404.1520(a)(4)(v). If he cannot, the Commissioner will find him disabled. *Id.*

## B.      Time Line of Administrative Proceedings.

Cahill was born January 26, 1964. (Admin. R. 91.) Cahill sustained a back injury in late August 2004 while working as an auto mechanic, when he tried to lift a Hummer tire. (*Id.* at 354, 386.) He was forty years old at the time. (*See id.* 158.) He filed a protective application for DIB on November 8, 2007, claiming disability since September 3, 2004, the date he stopped working. (*Id.* at 247; 45.) Cahill's application was denied on March 6, 2008. In its denial letter, the Social Security Administration explained that Cahill did not qualify for DIB because he had the ability to perform past work—namely, he had previously worked as an insurance salesman for one year. (*Id.* 110.) On April 3, 2008, Cahill requested an administrative hearing before an administrative law judge ("ALJ") for a new determination. (*Id.* at 121.) The hearing was held before ALJ Richard A. Kelly on May 8, 2009. (*Id.* at 130.) At the hearing, the ALJ heard testimony from Cahill and Beth Kelley, a vocational expert. (*Id.* at 40-62.)

3

The ALJ issued an unfavorable decision on July 15, 2009. (*Id.* at 92-102.) He made the following relevant findings: Cahill met the insured status requirements of the Social Security Act through December 31, 2009 ("date last insured").[1] He had not engaged in a substantial gainful activity ("SGA") since September 3, 2004. He had a severe impairment, in that he suffered lower back pain due to degenerative disc disease. As for RFC, Cahill still had the capacity to perform a range of light work; specifically, he could lift and carry up to twenty pounds and could stand and walk for four hours during an eight-hour workday, but would need to change position every hour. The ALJ found that Cahill had past relevant work as a cook and auto mechanic,[2] but that he was unable to perform this past relevant work.  Finally, in light of Cahill's age, education, work experience, and RFC, the ALJ accepted the vocational expert's testimony that Cahill could work as a "production assembler" or a "sorter." (*Id.* at 101.) Based on this last finding, the ALJ determined that Cahill was not disabled from September 3, 2004, through the date of decision.

On July 22, 2009, Cahill requested that the Appeals Council review the ALJ's decision. (*Id.* at 148.) He argued that the ALJ improperly discounted the opinion of his treating physician, Dr. Thomas Whalen. (*Id.* at 288-292.) In an order dated March 10, 2010, the Appeals Council granted the request, vacated the ALJ's decision, and remanded the case for a new hearing and determination. (*Id.* at 104-105.) The Appeals Council found that the ALJ had failed to consider the most recent medical evidence and records submitted by Dr. Whalen through March 2009. It

---

[1] Under 42 U.S.C. § 423(a)(1), an individual must both be insured and under a disability to qualify for DIB. The date last insured is the last day an individual is insured. (Pl.'s Br. 2 n.3.)

[2]  The ALJ did not consider Cahill's work as an insurance salesman to constitute past relevant work. No explanation is given, but I will assume it did not qualify because Cahill sold insurance for only three months, not a year. *See* 20 C.F.R. § 404.1560(b)(1) (advising that briefly held jobs will not be considered past relevant work).

directed the ALJ to evaluate this evidence, as well as evidence submitted to the Appeals Council

after the ALJ's decision. The Appeals Council also noted that the ALJ had asked the vocational

expert to suggest jobs based on an assumed RFC for a full range of light work, whereas the ALJ

explicitly found an RFC for light work with the limitation of standing and walking for four hours

during an eight-hour work day. Given this mismatch, the Appeals Council directed the ALJ to

"[o]btain supplement evidence from a vocational expert to clarify the effect of the assessed

limitations on the claimant's occupational base."[3] (*Id.* at 105.)

A second hearing was held before ALJ Kelly on March 23, 2011. Cahill and Daniel

Rapucci, a new vocational expert, testified. (*Id.* at 65-90.) On April 20, 2011, the ALJ again

issued an unfavorable decision, finding that Cahill was not disabled under the statute during the

relevant period—September 3, 2004 through December 31, 2009 (the date last insured). He

found that Cahill did not engage in SGA during this period. He found the following severe

impairments during the relevant period: low back pain from degenerative disc disease and a left

shoulder impairment from adhesive capsulitis. The ALJ modified his RFC finding: "through the

date last insured the claimant had the [RFC] to perform light work . . . except that the claimant

must be permitted to change position occasionally and had no ability to reach and lift overhead

with the left upper extremity." (*Id.* at 33.) Cahill was unable to return to his past relevant work as

a cook or auto mechanic. However, the ALJ found that, in light of his age, education, work

experience, and RFC, Cahill could work as an "inspector/sorter" or "production worker (small

products assembler)." (*Id.* at 36.) Thus, he was not under a disability at any point during the

---

[3] "The occupational base is the total number of unskilled jobs available in each exertional category [(sedentary, light, medium, heavy or very heavy)]." *Martin v. Barnhart*, 240 F. App'x 941, 944 (3d Cir. 2007).

relevant time frame.

Cahill asked the Appeals Council to review the ALJ's decision on April 27, 2011. He wrote a letter to the Appeals Council on June 7, 2012, setting forth his arguments for review. First, he alleged the ALJ relied too heavily on the opinion of a state agency medical consultant. Second, the ALJ failed to give controlling weight to the treating physician, Dr. Whalen. Third, the ALJ improperly gave limited weight to the opinion of another examining physician, Dr. Robert Sing, while failing to state what weight he gave to the opinion of a third examiner, Dr. Sofia Lam. Fourth, he gave inadequate reasons for discrediting Cahill's testimony about the severity of his impairments. Cahill also sought to introduce "new and material evidence" in the form of additional medical documents from Drs. Whalen and Sing, as well as records from a neurologist, Dr. Leonard Geiger, and from Paoli Hospital. He averred that these records substantiated Dr. Whalen's opinions and his personal testimony by documenting his "persistent symptoms from chronic spinal impairments." (*Id.* at 311.)

Cahill sent another letter to the Council on August 7, 2012, raising additional arguments.[4] (*Id.* at 313-315.) He contended that the ALJ had not complied with the Council's previous remand order, in that the ALJ failed to note and resolve discrepancies between the vocational expert's testimony and information contained in the Dictionary of Occupational Titles ("DOT").[5]

---

[4] This letter also reveals that Cahill's case had been marked critical, per his request of April 17, 2012. (*See* Admin. R. 24.) Cahill requested critical status because he was behind on his bills and rent; the August 7, 2012 letter adds that he needed a decision as soon as possible because he was "in imminent danger of losing his home." (*Id.* at 313.)

[5] The DOT is "a publication of the United States Department of Labor that contains descriptions of the requirements for thousands of jobs that exist in the national economy." *Martin*, 240 F. App'x at 941.

Specifically, the job alternatives suggested by the vocational expert—and accepted by the ALJ—included frequent or constant reaching and had no "sit/stand option." According to Cahill, this was inconsistent with the limitations identified in the RFC finding, which required occasional changes in position and no reaching. (*Id.* at 314.) Cahill further argued that the ALJ erred when he failed to consider Cahill's gout a severe impairment as part of the disability inquiry.

The Appeals Council accepted the additional evidence into the record; nevertheless, it concluded review was not justified under the applicable laws and regulations. Thus, the ALJ's decision of April 20, 2011, stands as the final decision of the Commissioner of Social Security with respect to Cahill's application for DIB. (*Id.* at 3-6.) On October 9, 2012, Cahill initiated this civil action in the nature of a review of the Commissioner's decision. (Compl.)

### C.      Evidence Submitted to the ALJ

I will summarize the information contained in the record insofar as it is relevant to the case at hand.[6] In the first hearing, the ALJ considered testimony from Cahill himself and a

---

[6] Plaintiff concedes that I am not allowed to consider evidence that was accepted into the record by the Appeals Council as part of its decision to deny review, since that evidence was never before the ALJ. (Pl.'s Br. 3 n.5.) *See Matthews v. Apfel*, 239 F.3d 589, 591-595 (3d Cir. 2001) (stating that "evidence that was not before the ALJ cannot be used to argue that the ALJ's decision was not supported by substantial evidence").

However, there appears to be confusion about what exhibits were before the ALJ. In the Appeals Council's order denying review, Exhibits 13E, 14E, and 25F through 30F are incorporated into the record, which would imply they were not before the ALJ. (Admin. R. 6.) In his brief to the court, despite his concession, plaintiff attempts to cite to these very exhibits (specifically 25F and 26F).

At the beginning of the second hearing, the ALJ stated that all exhibits through 24F were in the record. (Admin. R. 65.) At the end of the hearing, counsel stated that he would submit additional records. (*Id.* at 90.) In his comments on the case, submitted to the Appeals Council on June 7, 2012, as part of his second request for review, Cahill complained as follows: "at the hearing on March 23, 2011, the ALJ stated on the record that he was allowing thirty days for

vocational expert. In his opinion memorandum, he referred to treatment records from Drs.

Charles Odgers, Lawrence Buckland, Sofia Lam, Whalen, and the Bryn Mawr Family Practice

Center. He also discussed the results of a consultative examination with Dr. Stanton Bree. He

cited hospital records from Paoli Hospital and Bryn Mawr Hospital. Finally, he noted a state

agency's evaluation[7] of Cahill's physical limitations.  Other evidence in the record at the time of

the ALJ's first decision, but not explicitly relied upon in his opinion, included emergency room

records from Paoli Memorial Hospital and additional medical reports from Dr. Whalen.

At the time of the first hearing, Cahill was forty-five years old. (Admin. R. 41.) He

testified that he had driven to the hearing, and that over the previous year he had driven 1,200

miles. (*Id.* at 43.) After graduating high school he attended Rhode Island School of Design and

Culinary Arts and received a Culinary Arts Associate's Degree. In 1998, he attended and

graduated from an automotive training center. His last job prior to the hearing was as a mechanic

at Armen Chevy in Ardmore, Pennsylvania; Cahill worked as a mechanic for a sum total of five

---

additional medical evidence to be submitted. However, the ALJ issued his decision before the
deadline of April 22, 2011." (*Id.* at 311.) Cahill stated that he requested an extension of the
thirty-day deadline on April 15, 2011, but it appears this request was not addressed by the ALJ.
The request does not appear in the administrative record. Moreover, the letter reveals that the
exhibits did not appear on a compact disc containing exhibits involved in the case, sent to
plaintiff's counsel on May 17, 2012, though Cahill claimed that the records were "previously
submitted." (*Id.* at 17, 311.)

It appears then, for whatever reason, plaintiff failed to submit Exhibits 25F and 26F to the
ALJ, or else the ALJ never received and considered them. (*Id.* at 732-756.) Plaintiff has not
attempted to argue good cause for the omission of this information, such as might allow for
remand to the Commissioner for consideration of this evidence. *See Matthews*, 239 F.3d at 593.
Thus, I will disregard any information or arguments derived from these exhibits.

[7] When the Social Security Administration denied Cahill's application on March 6, 2008,
it explained that "[d]octors and trained staff looked at this case and made this decision. They
work for the state but used our rules." (Admin. R. 111.) I presume that the state agency
evaluation was generated as part of this initial review process. (*See id.* at 91, 433-439.)

years. Before working as a mechanic, he worked as a cook in various restaurants. He also worked briefly (three months) as an insurance salesman. (*Id.* at 43-45.)

Cahill testified that a back injury had kept him from working since September 3, 2004. At the time he got hurt, he also suffered from gout, for which he sought treatment from Dr. Whalen. Cahill was regularly taking oxycodone and oxycodone IR for his back pain and over-the-counter pain relievers. He testified that he disliked taking the medication because it makes him lightheaded and tired, and that it only helps a little with his pain. Because Cahill had just secured insurance, he was seeing another doctor for a left shoulder injury, and was set to start full time treatment with "Dr. Buckman" at Paoli Family Medicine. He was doing simple physical therapy for his shoulder. He had taken Allopurinol for his gout, but it "t[ore his] stomach up," so he had switched to taking Omega 3, 6, and 9 to fix the gout. In 2007 and 2008, Cahill went to Bryn Mawr and Paoli Hospitals complaining of chest pains and difficulty breathing; Cahill testified that the doctors "really didn't find anything." (*Id.* at 45-49.)

Cahill described his symptons as numbing pain in the small of his back, going down (mainly) his left leg. (*Id.* at 45.) He also mentioned numbness and tingling in his leg and foot. (*Id.* at 46.) He estimated he could walk two city blocks before pain started in his back; if he continued, it got worse and the pain began to radiate down the left leg to his big toe. He could stand for about forty minutes, and then needed to lie down. He could sit for forty minutes to an hour, and then had to get up or lie down. He could not bend at the waist (to pick something up off the floor, for example), and he could only squat with severe pain. He could walk up and down stairs, but with pain in his lower back and leg. He testified that he did not carry anything over ten pounds. He stated that there was nothing wrong with his arms, hands, or fingers, but that he had a

"frozen" left shoulder. A few months prior to the hearing, Cahill's left leg collapsed under him, which led him to fall. This had happened four or five times. He did not seek treatment for the shoulder because he did not have insurance and he assumed it would get better on its own. Cahill could not reach above his head with the left arm due to his shoulder. (*Id.* at 49-51; 56.)

Cahill testified that he did his grocery shopping at a store across the street from his house. He could manage some housework, but his house was "real dirty." He got help for some activities from his cousins, and he had someone take out his trash for him. He fed himself, mostly with canned soup. He laundered his own clothes, and his washing machine was set up such that he did not have to bend. He occasionally socialized, such as when he visited his aunt's house for an hour during the prior Easter. He occupied himself by watching television. He loved fishing, but the last time he had gone was two weeks before his injury. On days when he felt less pain, Cahill would shower, clean, get some laundry done, and try to wash the dishes. He would try to go out and see a friend. He received income in the form of insurance payments for long-term disability through Hartford insurance. (*Id.* at 53-55.)

Cahill had difficulties sleeping; after lying down for a while, he would wake up in extreme pain. He averaged about four hours of sleep per night. He spent seventy to eighty percent of the day lying down in his motorized recliner or bed. He had been using a cane for two years to balance himself when he walked. He had difficulty showering, and would sometimes forego it for a few days. He used a handicapped shower. He had difficulties concentrating, because pain would distract him from whatever task was at hand. (*Id.* 55-57.)

Ms. Kelly, the vocational expert, testified as follows. Cahill's prior jobs as cook and auto mechanic were both skilled labor with medium to heavy exertional level. The ALJ asked if there

would be jobs for a hypothetical claimant who could perform a full range of light work, but with the need to occasionally change position every hour or so (between sitting and standing). The vocational expert responded that jobs such as production assembler or sorter would satisfy these criteria. She stated that there were 7,000 assembler jobs in the region and 300,000 nationally; as for sorter, there were roughly 500 in the region and 60,000 nationally. The ALJ then asked the vocational expert to posit a claimant with the levels of pain and limitations to which Cahill testified. She testified that there would be no work possible for such a claimant. The ALJ then pointed to assessment from Dr. Whalen, which indicated a capability to engage in work activity for three hours and a prohibition on postural activities. The vocational expert testified no jobs existed to fit this profile. (*Id.* at 59-62.)

The Bryn Mawr Family Practice records date from March 2004 to January 7, 2008. (*Id.* at 327-353.) An entry from February 2005 notes a history of gout in Cahill's right foot, as well as his complaint that he could not sleep for more than a few hours at a time due to his chronic back pain. (*Id.* at 331.) An entry from July 2004 reveals that Cahill's gout caused him such severe pain in his right foot that he would awaken from sleep, but that he preferred not to take medication because it put him in a daze. (*Id.* at 334.) An entry on September 7, 2004, shows that Cahill went to the "Paoli ER" complaining of hip pain, and on September 8, 2004, he complained of pain in his hips, lower back, and down his legs. However, when he sat, it seems the pain abated. (*Id.* at 339.) On September 9, 2004, the doctor noted that Cahill believed his pain was caused by a lower back injury he sustained a "few weeks ago." (*Id.* at 340.) The records show that Dr. Whalen had previously been treating Cahill for gout, and that Cahill continued seeing Dr. Whalen with regard to his back pain. (*Id.* at 339-341.)

11

On October 9, 2006, Dr. Sofia Lam examined Cahill and issued a report. (*Id.* at 354-356.)
She found lumbar radiculopathy with the main focus in the left L5 root distribution; mechanical
low back symptomatology with lumbar facet arthropathy; and myofascial pain symptomatology
as a result of sprain/strain injury. She relied on the results of an MRI of the lumbosacral spine,
which revealed disc protrusion at L4-5 level with facet joint hypertrophy at lower segmental
levels. She conducted a straight leg raise test ("SLR") that was positive only on the left side, at
elevation of ten degrees. She found no evidence that Cahill was malingering, and noted that he
presented objective symptoms of severe lumbar radiculopathy

Records from Paoli Memorial Hospital dated May 5, 2007, reveal Cahill was taking the
following medications at the time: Oxy RI, five milligrams daily; Oxycodone, fifteen milligrams
daily; and Prilosec. He had also recently finished a cycle of steroid treatment for his lower back
pain. (*Id.* at 366.)

Dr. Stanton Bree dictated a report on February 11, 2008. (*Id.* at 375-380.) At that point,
Cahill was taking Oxycontin and Omega 3, 6, and 9. Dr. Bree noted that Cahill's gait showed no
pathological abnormalities. He observed that SLR was negative while sitting and supine, and that
there was no pain when he palpated the lumbosacral paraspinal muscles. He noted a full range of
motion ("ROM") in the right and left shoulders, elbows, wrists, and knees. Backward extension
of the right and left hips was limited to twenty degrees on a scale of zero to thirty degrees, but
there was a full ROM in all other planes. Lateral flexion of the cervical spine was limited to
thirty-five degrees on a scale of zero to forty degrees on the right side and full on the left; full
ROM on all other planes of the cervical spine. Dr. Bree observed significant limitations in the
ROM for flexion and extension of the lumbar spin: thirty degrees of flexion on a scale of zero to

12

ninety degrees, and five degrees of extension on a scale of zero to thirty degrees. There was full

ROM for right and left flexion of the lumbar spine and for the right and left ankles. He concluded

that Cahill was limited to occasionally lifting and carrying fifty pounds; could stand for four

hours in an eight-hour workday; and had no limitation in sitting, pushing, pulling, postural

activities (such as bending or climbing), or "other physical functions" (including reaching and the

five senses). The only recommended environmental limitation was to avoid all exposure to

vibration.

Whalen Rheumotology Group submitted a "Medical Source Statement of Claimant's

Ability to Perform Work-related Physical Activies" to the state agency disability adjudicator on

an unknown date (*id.* at 381-383), though presumably close in time to Dr. Bree's report (*see id.* at

439). It noted that Cahill was limited to the occasional lifting and carrying of two to three

pounds; could only stand one hour and sit one to two hours in an eight-hour workday; and was

totally unable to push and pull with his lower extremities. Cahill could never perform postural

activities, and his ability to reach was limited. Furthermore, the form listed a series of possible

environmental restrictions, all of which were checked; Cahill was to avoid poor ventilation,

heights, moving machinery, vibration, temperature extremes, chemical (no further specification),

wetness, dust, noise, fumes/odors/gases, and humidity.

Whalen's treatment records[8] span from August 5, 2004, to March 16, 2009. (*Id.* at 384-

419; 440-483.) The treatment notes of August 20, 2004, reflect treatment for gout in the right

ankle and foot. An entry on September 9, 2004, indicates that Cahill reported lower back pain

---

[8] "Rheumatology Consultants"or "Whalen Rheumatology Group" is the label on the
records, but the ALJ refers to them as Dr. Whalen's records. It appears Kelly O'Connor, MSN,
CRNP also sometimes examined Cahill.

moving into his left hip and both legs, with greater pain in the left leg; it states that he "felt wrench in his back" when "lifting Hummer tire" on August 26, 2004. The doctor diagnosed osteoarthritis and a lumbar strain/sprain, and recommended heat/stretch therapy with a fair prognosis. He noted positives for SLR and spasms. The notes were essentially the same on September 23, 2004, with the addition that Cahill was disabled and out of work for four weeks. On November 22, 2004, Dr. Whalen noted his impression that Cahill suffered from lumbar spinal stenosis and radiculopathy. On September 15, 2005, he recommended an injection of Depo-Medrol for lower back pain and pain in the lower left extremity, and doses of Motrin. He noted lumbar spasms, positive SLR for the left leg, and weakness in Cahill's left side. On August 14, 2006, Dr. Whalen noted complaints of a constant ache in the lower back and lower left extremity, with numbness in the groin/pelvis when sitting, and associated with stiffness and fatigue. He observed that Cahill's deep tendon reflexes were symmetrical, but reduced. He observed lumbar spine flexion at twenty-five to thirty degrees, and extension at five to ten degrees. He prescribed Vicoden, and, if no improvement, an injection of Depo-Medrol. On September 12, 2006, he noted lower back pain of seven out of ten, with numbness and parestesthisias. He prescribed Oxy IR and ordered an MRI.

The MRI was conducted September 19, 2006. (*Id.* at 410.) The report revealed that "the intervertebral discs have mild degeneration of the lower levels at L4-L5 and L5-S1" with "no focal disc herniation" and "no spinal stenosis or foraminal encroachment." It reported that "at the L4-L5 level, there is a broad-based posterior disc herniation," which it identified as a "small, broad-based protrusion of approximately 3-4 mm AP diameter, which is approaching the contour of the thecal sac, without deformity or visible impingement." The MRI report stated that the

14

appearance of the lumbar spine was similar compared to a previous MRI. This is confirmed in the record by an MRI report dated September 12, 2004. (*Id.* at 412.)

Dr. Whalen again examined Cahill on September 25, 2006. He noted discomfort in the lower back lasting for years at an intensity of five out of ten. He noted mild improvement with the current therapeutic program, but no predicted improvement in functional status. Rest improved the symptoms, while increased activities of daily life worsened them. There was parestesthias in both legs, worse in the left. Cervical ROM was within normal limits; lumbar ROM was thirty percent of normal with pain and severe spasm; shoulder, hip, and knee ROM were all normal. He noted a positive SLR bilaterally along with an increased lumbar paravert spasm. His impressions were low back pain, radiculopathy, osteoarthritis, and muscle spasm, but nothing to suggest active gout. The prognosis was poor, and Dr. Whalen opined that Cahill was "totally disabled." (*Id.* at 392.)

The same observations were reported in November 14, 2006. The report of December 14, 2006, was similar, except that Dr. Whalen noted pain of eight out of ten, with functional status estimated to be fifty percent of normal. He noted a fifty percent lumbar ROM. Similar observations of lower back pain and disc radiculopathy were noted in most of the examinations throughout 2007 (January 11, February 12, March 18, April 22, May 7, May 17, June 14, July 19, September 13, October 11, November 8, November 30, December 27). The doctor also noted a flare up of Cahill's gout at certain examinations. On August 16, 2007, Cahill's medications were listed as Oxy IR and Oxycodone. A Medrol Dose Pack was added. Cervical and lumbar ROM were fifty percent of normal, but the SLR was negative. On October 11, 2007, it was noted that Cahill could not sit because it led to an immediate increase in back pain along with burning down

both legs. On January, 24, 2008, the observations were largely unchanged; the examiner recorded a lumbar spine ROM of twenty-five percent of normal.

Subsequent examinations revealed worsening symptoms. On February 6, 2008, the lower back pain was rated ten out of ten, with acute exacerbation of a stabbing nature from the lower back into the left leg. There was no evidence of active gout. The doctor noted no improvement with the current therapy program and an estimated ten percent improvement in functional status; parestesthias in both legs, left worse than right; proximal muscle weakness; a lumbar ROM of thirty percent with pain and severe spasm; a bilaterally positive SLR; and increased lumbar paravert spasm. The examiner's impressions were low back pain, radiculopathy, osteoarthritis, muscle spasm, and interval gout. Examinations on March 17 and May 12, 2008, produced the same results, with a slight reduction in reported pain intensity and resolution of the acute exacerbation due to bed rest.

An examination on June 3, 2008, added the following observations. Cahill's functional status was ten percent of normal; while medication had produced a mild improvement in his symptoms, he could not move without pain. The SLR was positive on the left, his gait was antalgic, and ten of eighteen myofascial trigger points (MTPs) were noted, but there were no longer spasms. His cervical ROM was slightly reduced. New impressions included myofascial pain and herniated nucleus pulposus. A June 26, 2008 exam revealed worsening shoulder pain, but was otherwise the same. Examinations of July 24, August 21, September 18, and October 16, 2008, were largely the same, except that only eight MTPs were noted in the latter three. On November 17, 2008, the doctor noted that Cahill's gait was "slow and wide based" and his cervical ROM was seventy-five percent of normal; otherwise, the observations remained the

16

same. These notations were repeated in the December 15, 2008 report. On January 19 and February 14, 2009, Dr. Whalen noted eleven out of eighteen MTPs; otherwise, his observations were the same.

On March 16, 2009, Cahill complained of a "severe flare" in his symptoms, with increased pain and spasms. Twelve of eighteen MTPs were observed; his cervical ROM was fifty percent of normal with pain and spasms; and his lumbar ROM could not be assessed due to pain and severe spasm. The doctor recommended a trial of Medrol Dose Pack in addition to the usual medication.

Dr. Whalen noted an antalgic gait on August 20, 2004 (presumably due to gout); September 9, 2004; September 23, 2004; November 22, 2004 (both antalgic and "wide-based"); November 14, 2006; May 12, 2008; June 3, 2008; June 26, 2008; July 24, 2008; August 21, 2008; September 18, 2008; October 16, 2008; January 19, 2009; February 16, 2009; and March 16, 2009. He noted a "slow and wide-based" gait on November 17, 2008, and December 15, 2008. No comment on Cahill's gait appears in records dated September 15, 2005, and August 14, 2006. Dr. Whalen noted a gait within normal limits on September 3, 2004; September 12, 2006, September 25, 2006; December 14, 2006; January 11, 2007; February 12, 2007; April 9, 2007; April 22, 2007; May 7, 2007; May 17, 2007; June 14, 2007; July 19, 2007; August 16, 2007; September 13, 2007; October 11, 2007; November 8, 2007; November 30, 2007; December 27, 2007; January 24, 2008; February 6, 2008; February 21, 2008; and March 17, 2008.

On January 19, 2009, Dr. Whalen completed a statement of functionality on Cahill's behalf for Hartford Life and Accident Insurance Company. (*Id.* at 486-87.) In addition to the prior diagnoses, he noted that Cahill had a torn rotator cuff. He stated that Cahill could stand and

17

sit for a total of thirty minutes each in a given workday. He could not walk. He could not lift or

carry items of any weight, ever. He could not reach above shoulder-level with his left arm at any

time, and he could only occasionally do so with his right arm. He could not reach below waist-

level with either arm, and he could only occasionally reach at waist level with both arms.

In letters dated February 20 and May 30, 2007, Dr. Whalen emphasized that Cahill had

not responded favorably to the treatment program, his prognosis was poor, and his chronic lower

back pain was unrelated to his diagnosis of gout. He also opined that Cahill had no tendency to

embellish his symptoms or functional deficits. (*Id.* at 416-419.) In a letter dated May 5, 2009, Dr.

Whalen repeated these assertions and added that surgical intervention would not afford Cahill

any relief, and that his symptoms would have to be managed through pain medication and

exercise to even maintain minimum functional status. (*Id.* at 488-490.)

Dr. Whalen completed a spinal impairment questionnaire on May 7, 2009. (*Id.* at 491-

498.) It largely repeated the observations outlined in the treatment notes: there was constant,

chronic lower back pain with acute exacerbations; limited ROM of fifty percent or less in the

cervical and lumbar spine; tenderness in both upon palpatation of the paravert muscles; muscle

spasms in the lumbar; decline in reflexes down from lumbar into the lower left extremity;

atrophy, muscle weakness, and trigger points at the lumbar spine; abnormal gait; and a positive

left SLR at thirty degrees. Dr. Whalen noted that the MRI demonstrated herniated nucleus

pulposus at L4-5, which was consistent with the clinical observations and stated diagnoses, as

well as Cahill's symptoms and functional limitations. He opined that, in a work setting, Cahill

would have to get up and move every five to ten minutes, and could only sit again after five to

fifteen minutes. He would have to take unscheduled breaks more than two to three times an hour,

18

and he would have to rest anywhere from fifteen minutes to two hours. He could not hold his

neck in a constant position, so as to look at a desk or screen, and he would be absent from work

more than twenty times a month. Dr. Whalen also observed that Cahill would have "limited

vision" that would affect his ability to work.

After the hearing, Cahill gave the ALJ hospital records from Bryn Mawr Hosptial dated

August 13, 2008, and January 14, 2009. (*Id.* at 499-537.) These records were taken pursuant to

hospital visits for conditions unrelated to Cahill's disability claim (viral infection in 2008 and

chest pain in 2009). As is relevant here, the August 2008 record notes limited ROM in the left

shoulder. There is no other notable information in these records.

Cahill also provided records from Dr. Buckland at Paoli Family Medicine, dated April 27

and May 12, 2009. (*Id.* at 530-540.) The earlier record notes back pain and left shoulder pain, as

well as chest and abdominal pain. The latter record reveals that Cahill had been admitted to an

unspecified emergency room the prior day, and notes only chest pain. There is also a notation for

May 23, 2009, which indicates that Cahill called in complaining of severe abdominal pain that

had continued without improvement for a few days.

Buckland sent Cahill for an orthopaedic consultation with Dr. Odgers on May 4, 2009.

(*Id.* at 542-549.) Dr. Odgers noted numbness in the left leg and foot. Cahill reported that two

months prior he had slipped and fallen on his left side, and there was now pain in the left anterior

shoulder "radiating to L 4th, 5th fingers," with occasional popping. "Subjective symptoms"

included limited shoulder ROM, especially with abduction and internal rotation.  Odgers

conducted an X-ray of the shoulder and assessed Cahill with left shoulder adhesive capsulitis.

Records from Paoli Hospital dated September 7, 2004, and March 15, 2008, were

provided to the ALJ. (*Id.* at 550-564.) The 2008 record pertains solely to Cahill's complaints of chest pain and tightness. The September 2004 record seems to pertain to Cahill's back injury, though it specifies his diagnosis only as "bursitis." The report notes that Cahill was walking with a limp; upon discharge from the Hospital, he rated his pain at an intensity of eight out of ten. He was medicated with Toradol, Percocet, and Ibuprofen.

The ALJ pointed to the March 6, 2008 RFC assessment of a state agency disability adjudicator, Kelly McDonald, in his first opinion. (*Id.* at 433-439.) McDonald found that Cahill could occasionally lift or carry twenty pounds and could frequently lift or carry ten pounds. He could stand or walk (with normal breaks) for about six hours in an eight-hour workday. He could sit for about six out of eight hours. He had unlimited push and/or pull capacity. With regard to postural activities, McDonald found that Cahill could occasionally climb (use ramps, stairs, and ladders), stoop, kneel, crouch, and crawl; he could frequently balance. She found no manipulative restrictions, including reaching overhead, and no visual, communicative, or environmental limitations. McDonald acknowledged that her findings were significantly different from the findings in the treating source statement (from Dr. Whalen).

Additional evidence was submitted to the Appeals Council; when it granted review and remanded, this evidence was considered by the ALJ in connection with the second hearing and decision. The relevant additional evidence included new, more recent treatment records and a letter from Dr. Whalen; a spinal impairment questionnaire from Dr. Robert Sing; more recent records from Paoli Hospital; and updated records from Paoli Family Medicine. As part of the second hearing, the ALJ also heard testimony from Cahill and another vocational expert.

The newly submitted treatment records from Dr. Whalen spanned from September 10,

2009, to December 3, 2010. (*Id.* at 566, 719-727.) The observations stemming from the

September 10, 2009 exam were consistent with the prior records adduced at the first hearing. Dr.

Whalen noted the following impressions: low back pain; radiculitis/radiculopathy—left L4-5

distribution; herniated nucleus pulposus; myofascial pain; and "gout—resolved." (*Id.* at 566.) He

measured cervical ROM limited to fifty percent of normal with pain and spasm, and lumbar

ROM limited to fifty percent with pain and severe spasms. The SLR was positive on the left side,

gait was antalgic, and there were twelve out of eighteen MTPs. Dr. Whalen noted proximal

muscle weakness. The examination results were largely the same on March 16, 2010, except that

lumbar ROM was twenty-five percent of normal and sixteen out of eighteen MTPs were noted.

Pain had increased due to exacerbation of acute sciatica. (*Id.* at 719.) Cahill's dosage of

oxycodone was increased to deal with the increased pain. By April 13, 2010, the lumbar

radiculitis had subsided somewhat and cervical and lumbar ROM had increased to seventy-five

and fifty percent respectively. (*Id.* at 720.) Similar observations of lower back pain and stiffness,

along with a lower left extremity radicular pain pattern and limited spinal ROM, were noted on

May 11, June 8, July 6, August 3, August 31, November 1, and December 3, 2010. (*Id.* at 721-

727.) In June, the doctor added an impression of shoulder periarthritis, which persisted into July,

because of the "increase[d] stress of moving around in bed or getting out of chair." (*Id.* at 722.)

The doctor noted severe synovitis of the right ankle in July 2010 due to a flare-up of gout; this

made walking severely painful. (*Id.* at 723.)

      In a letter dated October 16, 2009, Dr. Whalen writes that Cahill's condition has steadily

worsened, with growing restrictions of ROM and increased level of spasms. He was unable sit

for more than a few minutes, and had no capacity to lift anything above five pounds. He opined

that Cahill's "history is consistent with his physical findings" and that he had "MRI findings consistent with his pain pattern." (*Id.* at 568.) He states that Cahill could not manage sedentary work in a competitive environment for even one day.

The spinal impairment questionnaire submitted by Dr. Sing (*Id.* at 570-77) is dated February 18, 2010, and verifies Dr. Whalen's findings. Dr. Sing diagnoses lumbar disc herniation, L4-5 and L5-S1, with radiculopathy; degenerative disc disease/degenerative joint disease in the lumbosacral spine with facet arthropathy; and adhesive capsulitis with rotator cuff tear in the left shoulder. He notes a limited ROM in the lumbar spine, flexion limited to thirty degrees and extension limited to five degrees. He notes tenderness and "very prominent" spasms at the lumbar spine, along with bilateral muscle atrophy and weakness around the lumbar spine. He notes a stiff antalgic gait, and multiple trigger points upon palpitation of the lumbosacral spine concentrated more on the left than right side. He notes that an MRI of the lumbosacral spine confirms his diagnosis and that the reported pain symptoms—eight out of ten intensity in the lower back radiating to the lower extremity, and shoulder pain—is consistent with the observed physical impairments.

Dr. Sing estimated that in an eight-hour workday, Cahill could sit for less than one hour, stand/walk for less than one hour, would need to get up and move around every forty-five minutes, and could only sit again after a forty-five minute break. He noted that Cahill could frequently lift and carry zero to five pounds, and could occasionally lift and carry five to ten pounds; however, he could not lift anything above shoulder height with the left upper extremity. Cahill's pain would frequently interfere with his attention an concentration, and Cahill was not malingering. Dr. Sing affirmed that Cahill could tolerate moderate work stress, but he would

need to take unscheduled rest breaks "very often." He would likely be absent from work more than three times a month. With regard to environmental restrictions, Dr. Sing stated that Cahill must avoid wetness, temperature extremes, humidity, heights. He could not push, pull, kneel, bend, or stoop.

The ALJ also received extensive medical records from Cahill's numerous visits to Paoli Hospital, ranging from October 31, 2009, to June 3, 2010. (*Id.* at 579-705.) Cahill visited the ER complaining of— on different occasions—chest pain, groin pain, headaches, facial pain, leg numbness, pain and ringing in his left ear, neck stiffness, pain in the lower left extremity (left thigh, knee, and calf), dizziness, and fatigue. In a record dated November 22, 2009, upon complaint of pain in his left leg, Cahill was diagnosed with lumbar radiculopathy ("sciatica").[9] His current medications were listed as Flexeril, Nortriptyline, and Oxycodone, and no change was recommended. (*Id.* at 636.)

Cahill submitted records from Paoli Family Medicine dating from January 21, 2009, to September 10, 2010. (*Id.* at 707-717.) They also encompass visits based on a broad range of

---

[9] The hospital record provides a concise explanation of the condition (Admin. R. 636):

Sciatica ("Lumbar Radiculopathy") causes a pain that spreads from the lower back down into the buttock, hip, and leg, Sometimes leg pain can occur without any back pain.

Sciatica is due to irritation or pressure on a spinal nerve as it comes out of the spinal canal. This may be caused by an injury to the nearby muscles or ligaments of the spine; or it may occur when an injured spinal disk (the cartilage cushion between each spinal bone) bulges and pinches a nearby nerve.

Sciatica may begin after a sudden twisting/bending force (such as in a car accident), or sometimes after a simple awkward movement. In either case, muscle spasm is commonly present and contributes to the pain.

complaints: stomach pains and diarrhea, vomiting and nausea, insect bites, ear pressure and tinnitus, testicular discomfort, anxiety, a lump on the back of his knee, facial numbness and neck pain, and chest pain. A record dated April 27, 2009, reveals left shoulder pain, with tenderness over the left biceps tendon and a reduced abduction ROM. A record dated January 21, 2009, lists diagnoses of lower back pain, torn left rotator cuff, herniated nucleus pulposus L4-L5, and gout. It states that Cahill reported he was "waiting until he has insurance to pursue neurosurgical care and orthopedic intervention." (*Id.* at 717.)

Cahill was forty-seven years old at the time he testified in the second hearing before ALJ Kelly. He testified that he drove to the hearing, but that he does not drive often; in a prior fourteen-month period he had driven approximately 2,200 miles. He testified that he worked as an auto mechanic for about four years, up until September 3, 2004, when he stopped work altogether. Since the first hearing, his back and left leg had gotten worse, and his left shoulder continued to be a problem. Cahill mentioned that an MRI had been taken of his neck and back approximately two years prior. The ALJ noted that he did not have a copy of the results of that MRI. Cahill also mentioned that he had visited the Paoli Hospital ER a few weeks prior after waking up with tremors, high temperature, vomiting and neck and head pain. Cahill stated he was medicating with OxyContin and steroid packs. (*Id.* at 69-74.)

Cahill stated that he did not walk much, and that he had trouble walking from one end of the supermarket to the other (approximately one block). After that amount of walking, his back and both of his legs begin to hurt. He testified that he could stand for about ten minutes before he needed to move around. He could sit for twenty to thirty minutes at a time. He estimated that he could lift and carry eight to ten pounds. When he reached above his head with both arms, it

24

caused him great pain in the left shoulder. He could not stoop down without help, such as grabbing on to something. Going up and down steps caused him pain. Cahill testified that he does his own housework and cooks for himself, but mostly eats canned soup. His appetite is not good, and sometimes his back pain is so bad he has trouble feeding himself. He did his dishes and washed his own clothes. He did his food shopping by going to the supermarket across the street once a day, as part of his exercise. He socialized at his friend's restaurant, also across the street, where he sometimes ate dinner. He stated that he spent approximately forty minutes there per visit. Cahill added that dressing himself was difficult; he was able to put pants on, but he never wore socks, and he avoided wearing shoes "half the time." He spent ninety percent of his day lying in bed or his motorized recliner, watching television or DVDs. (*Id.* at 74-79.)

His only income was disability insurance payments. Since the prior hearing, he had lost his medical insurance. He began using a cane at all times whenever he walked about a year and a half before the second hearing. This was due to his repeated falls; his last fall was two weeks prior to the hearing. His left leg "gave out" and he bruised his left arm on a wall.  He was not using his cane at the time, because he was in his house. He held the cane in the right hand, and never the left, because his left shoulder could not support his weight should something happen to him. He could only stand for ten minutes when he had his cane. (*Id.* at 79-81.)

Cahill testified that he still had trouble sleeping. He slept three hours the previous night. He was unable to nap during the day, but felt fatigued throughout. He hired a person to cut his grass and take care of his yard work. He paid someone to take out his trash. He was not able to do his daily chores every day, and was unable to shower some days, due to his back pain. (*Id.* at 81-83.)

25

The ALJ then solicited testimony from Daniel Rapucci, a vocational expert. The vocational expert testified that Cahill's previous work as auto mechanic and cook were both skilled; the former was medium to marginal heavy exertion and the latter was medium. The ALJ posited a hypothetical claimant with dyslexia[10] and an RFC for light work, with the qualification that he needed an occasional change in position and could not reach overhead with the left upper extremity. He asked the vocational expert whether such a claimant could maintain any jobs. The expert answered that there existed unskilled jobs such as "finish inspector" (2,100 positions regionally and 160,000 nationally) and "small products assembly" (5,300 regionally and 390,000 nationally). He added that, in these type of jobs, work is done at a high bench. The worker can sit on a stool or stand at this bench, and there is no reaching overhead. He testified that "the hypothetical" was not at variance with the DOT descriptions. (*Id.* at 84-86, 88.)

The ALJ asked the vocational expert to posit a claimant with the limitations and pain to which Cahill testified. He asked if such a claimant could maintain any job. The expert answered no, but qualified that he was unsure of the exact nature of Cahill's sit/stand limitations based on the testimony. If Cahill needed to lie down after the stated periods of sitting or standing, he could not work a full eight-hour day. Cahill's attorney presented the hypothetical of claimant who could never lift any weight, bend, or reach above his shoulder with the left arm; could sit for fifteen minutes at a time, half an hour total in an eight-hour day; and could only occasionally reach at waist/desk level bilaterally; and stand a total of half an hour in an eight-hour workday.

---

[10] Cahill was diagnosed with dyslexia before or during high school. (Admin. R. 42, 255.) Alex Seigel, PhD, who evaluated Cahill as part of the state agency disability determination process, found that dyslexia had only a mild impact on his activities of daily living, social function, and concentration. (*Id.* at 430.)

The vocational expert testified that the sitting and standing limitations alone would preclude SGA. Never lifting any weight would also preclude SGA. The limitation of only occasional reaching at waist or desk height would eliminate many unskilled, light bench jobs. Under the hypothetical RFC, the claimant could not maintain any job. Bending and overhead reaching would not effect a claimant's ability to work as a small products assembler or inspector. (*Id.* at 87-88.) The attorney posited one more hypothetical claimant who could sit for one hour and stand or walk for one hour in an eight-hour workday, and who could occasionally lift/carry ten pounds. The expert answered that, based on the sitting, standing, and walking limitations, there was no available job. Finally, he testified that three or more absences a month (for a total of at least thirty-six per year) would not meet employment standards.

## II.      DISCUSSION

In the instant request for review, plaintiff challenges the ALJ's finding that he had the RFC "to perform light work . . . except the claimant must be permitted to change position occasionally and had no ability to reach and lift overhead with the left upper extremity."[11] He claims that the ALJ improperly evaluated the medical evidence before him and improperly discredited Cahill's testimony regarding his impairments. I address plaintiff's claim below.

### A.       Legal Standards

---

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b).

In reviewing the Commissioner's decision to deny DIB, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Chandler v. Comm'r of Soc. Sec.*, 667 F.3d 356, 359 (3d Cir. 2011). "Substantial evidence is less than a preponderance of the evidence, but more than a mere scintilla." *Johnson v. Comm'r of Soc. Sec.*, 497 F. App'x 199, 201 (3d Cir. 2012) (internal quotation marks omitted). "Courts are not permitted to re-weigh the evidence or impose their own factual determinations." *Chandler*, 667 F.3d at 359. The ALJ's determination of a claimant's RFC is a fact determination that need only be supported by substantial evidence. *See id.*; *Foley v. Comm'r of Soc. Sec.*, 349 F. App'x 805, 808 (3d Cir. 2009); *Fargnoli v. Massanari*, 247 F.3d 34, 44 (3d Cir. 2001).

If the Commissioner determines that a claimant has a severe impairment, but one that does not meet or equal a listed impairment, he must "assess and make a finding about [the claimant's] residual functional capacity based on all the relevant medical and other evidence in [the] case record." 20 C.F.R. § 404.1520(e). If, as is true here, "any of the evidence in [the] case record, including any medical opinion(s), is inconsistent," the Commissioner will "weigh the relevant evidence" and see whether he can reach a decision on disability based on the evidence he has. 20 C.F.R. § 404.1520b(b). The Commissioner will consider "medical opinion" evidence, which "are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [claimant's] impairment(s), including [claimant's] symptoms, diagnosis and prognosis, what [claimant] can still do despite impairment(s), and [claimant's] physical or mental restrictions." *Id.* § 404.1527(a)(2).

28

Opinions on certain issues are not considered to be medical opinions, "but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." *Id.* (d). An opinion stating that a claimant is disabled is one such example. And while the Commissioner will obviously look to "medical sources, including [a] treating source, to provide evidence, including opinions, on the nature and severity of [claimant's] impairment(s)" and the issue of RFC, "the final responsibility for deciding [RFC] is reserved to the Commissioner." *Id.* (d)(2).

In addition to medical opinion evidence, the Commissioner will consider a claimant's symptoms, which the regulations define as the claimant's own description of his physical or mental impairment.[12] 20 C.F.R. §§ 404.1528(a), 404.1529(a). But the Commissioner will also consider "the extent to which [claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* § 404.1529(a). "Objective medical evidence" includes "signs" and "laboratory findings."[13] Importantly, a claimant's statements

---

[12] I note that usage of term "symptoms" in the regulations is not entirely in conformance with the definition set out in 20 C.F.R. § 404.1528(a). That provision defines "symptoms" as a type of evidence (i.e., personal statements). In reality, the regulations freely switch between that definition and the layperson definition, which is simply the *content* of the above statements—that is, the feelings and experiences alleged. I, too, will use both senses of the word.

[13] "Signs are anatomical, physiological, or psychological abnormalities which can be observed, apart from" symptoms. "Signs must be shown by medically acceptable clinical diagnostic techniques." 20 C.F.R. § 404.1528(b). "Laboratory findings are anatomical, physiological, or psychological phenomena which can be shown by the use of medically acceptable laboratory diagnostic techniques. Some of these diagnostic techniques include chemical tests, electrophysiological studies (electrocardiogram, electroencephalogram, etc.), roentgenological studies (X-rays), and psychological tests." *Id.* (c).

alone are insufficient to establish disability: "there must be medical signs and laboratory findings which show that [a claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged." *Id.*

Furthermore, the finding of a medically determinable impairment that "could reasonably be expected to produce [claimant's] pain or other symptoms does not involve a determination as to the intensity, persistence, or functionally limiting effects of [those] symptoms." *Id.* (b). The severity of the symptoms alleged is evaluated in accordance with 20 C.F.R. § 404.1529(c):

> . . . In evaluating the intensity and persistence of your symptoms, we consider all of the available evidence, including your history, the signs and laboratory findings, and statements from you, your treating or nontreating source, or other persons about how your symptoms affect you. We also consider the medical opinions of your treating source and other medical opinions as explained [above]. . . .

> . . . Objective medical evidence . . ., such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption . . .. is a useful indicator to assist us in making reasonable conclusions about the intensity and persistence of your symptoms and the effect those symptoms, such as pain, may have on your ability to work. . . . However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements.

> . . . Since symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms. . . . Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions which you, your treating or nontreating source, or other persons report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account. . . . We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your treating or nontreating source, and observations by our employees and other persons.

The "other information" that is considered includes the claimant's daily activities; the circumstances of the claimant's symptoms, including location, duration, frequency, intensity, and

precipitating and aggravating factors; medication and other treatments for the symptoms; and medical and non-medical measures taken to relieve the symptoms. *Id.* § 404.1529(c)(3); *see also Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999) (citing regulations).

Once the Commissioner has ascertained the scope of a claimant's symptoms, he can use this to determine the symptoms' impact on claimant's "capacity to perform basic work activities." 20 C.F.R. § 404.1529(c)(4). He again looks to the evidence discussed above; in sum, "[claimant's] symptoms, including pain, will be determined to diminish [the] capacity for basic work activities to the extent that [the] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Id.* This diminution in capacity is the basis for formulating a claimant's RFC. *Id.* § 404.1529(d)(4).

An ALJ is obligated to explain in his decision what weight he gives to "all of the pertinent evidence before him." *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000). "Although the ALJ may weigh the credibility of the evidence, he must give some indication of the evidence which he rejects and his reason(s) for discounting such evidence." *Id.* "In the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored." *Id.* (quoting *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981)). The duty to explain is required in order to facilitate judicial review. *See Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.").

### B.    Application

After careful review of the record and the arguments raised by Cahill in his brief in

support of his request for review and in his objections to the RR, I will not disturb the findings of the ALJ with respect to plaintiff's RFC because they are supported by substantial evidence as explained in his decision of April 20, 2011.

The plaintiff's primary contention is that the ALJ did not give proper weight to the opinion of his long-time treating physician, Dr. Whalen. The regulations provide ample guidance to an ALJ on the consideration of "medical opinions." First, the opinion of an examining physician is generally weighted more than that of a non-examiner. 20 C.F.R. § 404.1527(c)(1). The opinion of a treating physician is especially prized: where "a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it will be given "controlling weight." *Id.* § 404.1527(c)(2). If the ALJ decides to give the opinion less-than-controlling weight, he weighs it according to the following factors: length, nature, and extent of the treatment relationship; frequency of examination; "supportability" in the form of, for example, "medical signs and laboratory findings"; consistency; and pertinent specialization of the physician. *Id.* § 404.1527(2)-(5). He will also apply any "other factors" that a claimant or others "bring to [his] attention, or of which [he is] aware, which tend to support or contradict the opinion." *Id.* § 404.1527(c)(6).

For the following reasons,  I find that the ALJ did not err in his treatment of Dr. Whalen's assessment. The ALJ declined to give controlling weight to Dr. Whalen's opinion because it was inconsistent with other pieces of evidence in the record. The ALJ cited the opinion of Dr. Bree, a consulting physician who examined plaintiff and who "assessed an ability to perform medium

exertional work." (Admin. R. 35.) The contradictory opinion of Dr. Bree was sufficient to divest

Dr. Whalen's opinion of "controlling weight."

The ALJ also explained that Dr. Whalen's assessment was belied by the doctor's own

treatment notes, which revealed, on numerous occasions, a gate within normal limits, no focal

muscle weakness, and symmetrical deep tendon reflexes. Plaintiff argues that the ALJ

manufactured this inconsistency by mischaracterizing Dr. Whalen's treatment notes. I partially

agree. While plaintiff is correct that later evaluations revealed an antalgic gait, this does not

contradict the ALJ's correct assertion that there were repeated exams that revealed a gait within

normal limits. The ALJ, however, states that Dr. Whalen's notes reveal that Cahill's ROMs were

"normal or nearly normal"; this is simply untrue as it pertains to the lumbar spine ROM, which

was consistently below fifty percent of normal. Nevertheless, the opinion of Dr. Bree was enough

to call Dr. Whalen's opinion into question.

In discounting Dr. Whalen's opinion, the ALJ also pointed to the results of an MRI

conducted on September 19, 2006, which he claims revealed only "minor degenerative changes

at the L4-L5 and L5-S1 levels, with small protrusions at L4-L5 but no impingement."[14] (Admin.

R. 34.) Plaintiff argues that the ALJ improperly substituted his own interpretation of the

September 19, 2006 MRI report for that of Dr. Whalen, a qualified physician. Plaintiff correctly

cites *Ferguson v. Schweiker* for the proposition that an "ALJ is not free to set his own expertise

_____

[14] Plaintiff argues that the ALJ mistakenly thought "Plaintiff had not had repeat MRI
studies." (Pl.'s Br. 9.) The ALJ only stated that plaintiff did not have a *follow-up* MRI; indeed,
the earlier MRI of September 12, 2004, is mentioned in the September 2006 MRI report. As for
the MRI on November 18, 2009, the ensuing report was never submitted to the ALJ. *See supra*,
note 6. In any event, the results of the last MRI were not significantly different from the results of
the previous two. (*See* Pl.'s Br. 9.)

against that of a physician who presents competent evidence" by "independently reviewing and interpreting the laboratory reports." 765 F.2d 31, 37 (3d Cir. 1985). And, indeed, Dr. Whalen unequivocally states in his letter of October 16, 2009, that Cahill "has MRI findings consistent with his pain pattern." (Admin. R. 568.) But, as explained above, the primary reason for discounting Dr. Whalen's opinion—that is, the contradictory opinion of Dr. Bree—still stands.

Having determined that Dr. Whalen's opinion was not entitled to controlling weight, the ALJ was left to weigh this piece of evidence alongside all other probative evidence, including Dr. Bree's assessment, in forming his RFC determination. The plaintiff takes issue with the ALJ's weighing of the evidence. The magistrate judge rejected plaintiff's arguments: "although the medical evidence in this case is mixed, with more doctors favoring a finding of disability, the ALJ relied upon sufficient substantial evidence, including objective test results, Cahill's testimony, and even Dr. Bree's report to some degree . . . to support his conclusion that Cahill was not disabled at any time before his last insured date." (RR 9.) Given the extremely deferential substantial evidence standard that binds me, I agree with the conclusion of the magistrate judge.

Plaintiff relies heavily on *Ray v. Astrue*, 649 F. Supp. 2d 391 (E.D. Pa. 2009) (Yohn, J.), to support his contention that the ALJ did not give sufficient weight to Dr. Whalen's opinion. (Pl.'s Br. 10.) In that case, I concluded that the ALJ gave an insufficient explanation for why he discounted a examining physician's report/disability evaluation. *Id.* at 404. The ALJ had three stated reasons for discrediting the report: inconsistency with the claimant's clinic treatment notes; inconsistency with the claimant's treatment regimen; and its lack of support from diagnostic testing. *Id.* With respect to the first reason, I found that the treatment notes contained

numerous "irregularities," which limited the weight the ALJ could give to the notes. In addition, to the extent the notes could be credited, the physician's report was actually consistent with them. *Id.* at 405. The ALJ also relied on the "absence of identified physical limitations in [claimant's] treatment notes" to discredit the physician's report. *Id.* However, I reasoned that the "mere absence of an assessment of limitations in the treatment notes does not render these notes inconsistent with" the report. *Id.* Rather, "the proper inference from silence about [RFC] in [a treating] physician's report is that the issue was not considered." *Id.*. (internal quotation marks omitted) (alterations in original).

The other two reasons given by the ALJ in *Ray* were also flawed. The ALJ's discussion of claimant's treatment regimen was inadequate because the ALJ "overlooked both the non-condition related reasons underlying [claimant's] treatment regimen and the instances of more than moderate medication." *Id.* at 407. I found that the absence of diagnostic testing was not an adequate reason to discount the report because the claimant, who could not afford this testing, requested such testing from the Social Security Administration, but the ALJ denied it. Given this denial, it was error to discredit the report on this basis. *Id.* at 406.

In this case, the ALJ has given record-supported reasons for discrediting Dr. Whalen's opinions. Namely, he has relied on Dr. Bree's reports and portions of plaintiff's own testimony pertaining to his daily activities. These pieces of evidence are not flawed in the way that the evidence in *Ray* was, and therefore *Ray* is inapposite.

Plaintiff further argues that "the assessment adopted by the ALJ was offered by a non-physician state agency adjudicator, not a physician." (Pl.'s Br. 5.) He cites this language in the decision: "As for the State agency, the State agency disability claims adjudicator's physical

assessment for light work (Exhibit 8F) is given great weight because it is consistent with the record as a whole." (Admin. R. 35.) The magistrate judge notes that the ALJ is prohibited from relying upon the opinion of a non-physician state agency adjudicator in evaluating a claimant's RFC. (RR 7 (citing 20 CFR § 404.1513.)) If the ALJ did, indeed, rely on McDonald's opinion, this would be error; however, the magistrate judge notes that since the ALJ also based his RFC determination on "the record as a whole," it would be pointless to remand to correct the error.

I add that the ALJ did not blindly adopt the state adjudicator's RFC assessment. Rather, he formed his own opinion of the claimant's RFC, and then noted that this assessment happened to coincide with that of the state adjudicator. The location of the above-cited language from the ALJ's opinion supports such a reading: the ALJ only mentions the state adjudicator's opinion *after* an exhaustive discussion of claimant's testimony and the records from Odgers, Bryn Mawr Family Practice Center, Lam, Whalen, and Bree, as well as MRI results. Despite the unfortunate reference to "great weight," it appears that the ALJ had already formed his opinion based on medical and other evidence that was appropriate for consideration and reliance. I conclude that, to whatever extent the ALJ committed error in relying upon the adjudicator's assessment, remand is not warranted.

The plaintiff also argues that the ALJ failed to acknowledge that Dr. Whalen's opinion was corroborated by the assessment of Dr. Sing. The ALJ gave Sing's opinion "limited weight" because "there were no other records from this physician in the record." (Admin. R. 35.) Plaintiff states that the ALJ is mistaken, because the record contains Dr. Sing's consultation notes. (Pl.'s Br. 11 (citing Admin. R. 732).) Actually, plaintiff is mistaken: as explained above, *see supra* note 6, this exhibit (25F) was *not* submitted to the ALJ. Instead the ALJ only had the spinal

36

impairment questionnaire filled out by Dr. Sing (Exhibit 19F), which contains no information

regarding the basis of his opinions.[15]

Furthermore, plaintiff argues that the ALJ did not properly consider Dr. Lam's opinion, in

that "the ALJ commented only that Dr. Lam found that plaintiff could not perform his past work

as a mechanic." (Pl.'s Br. 12 (citing Admin. R. 34).) This contention is contradicted by the

record, which shows that the ALJ thoroughly considered Dr. Lam's report: he noted her

diagnoses and recommended treatment. I do not believe that Third Circuit precedent imposes a

duty on the ALJ to reproduce, in his opinion, every detail of every piece of evidence before him.

*See Fargnoli*, 247 F.3d at 43 (stating only that the ALJ "must give *some* indication of the

evidence that he rejects" (emphasis added)).

Finally, plaintiff argues that "the ALJ's finding that plaintiff's subjective complaints were

not fully credible was tainted by his failure to properly evaluate the opinion of Dr. Whalen."

---

[15] The magistrate judge partially sides with Cahill on this point. He states that the ALJ rejected Dr. Sing's report on the basis that Dr. Sing met with Cahill only once. The magistrate judge found that this was "not a particularly convincing reason to discount the report, given that Dr. Whalen is the only medical source who treated Cahill on a long-term basis, and he agreed with Dr. Sing." (RR 8.) However, the ALJ found that Dr. Sing's opinion did not corroborate Dr. Whalen's opinion because Dr. Sing's opinion (as far as the ALJ could tell) was baseless. One cannot argue that Dr. Whalen's opinion corroborates Dr. Sing's opinion, which in turn corroborates Dr. Whalen's opinion: that is circular. Rather, Dr. Sing's opinion must stand on its own legs.

The magistrate judge states that it would be more compelling to discount Dr. Sing's report because it "was issued a full year after Cahill's last insured date." (RR 8.) As plaintiff notes in his objections, that is not correct. The report issued on February 10, 2010, and it notes that Dr. Sing examined plaintiff on November 17, 2009. Plaintiff's last insured date was December 31, 2009. Second, the court on judicial review is not allowed to fabricate reasons to support an ALJ's finding; the court must look to the reasons the ALJ himself gave. *See Fargnoli v. Massanari*, 247 F.3d 34, 44 n.7 (3d Cir. 2001) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943)).

(Pl.'s Br. 13.) However, the ALJ discredited plaintiff's "subjective allegations of disabling impairments" because he found the subjective allegations to be contradicted by other testimony given by plaintiff, not because he misconstrued the evidence from Dr. Whalen. As the ALJ noted, "The claimant testified to an ability to do household chores, cook, wash dishes, exercise, grocery shop, wash clothes, and walk in his neighborhood to a local restaurant." (Admin R. 35.) Moreover, the ALJ found the allegations were contradicted by objective medical evidence: "[t]he normal neurological examinations indicate normal strength, and thus standing and walking, as well as lifting 10 pounds frequently and 20 pounds on occasion should be within claimant's capacity." (*Id.*) In any event, "the entirety of the evidence supported the ALJ in failing to accept all of Dr. Whalen's findings." (RR 9.)

Plaintiff's arguments that the ALJ erred in his treatment of the medical and non-medical evidence before him are unavailing. The ALJ has clearly supported his RFC finding with an analysis that is internally consistent and consistent with the case record. Therefore, the ALJ has supported his finding that Cahill was not disabled before his date last insured with substantial evidence, and I will affirm his decision.

## III. Conclusion

For the reasons set forth above, I will affirm the decision of the Commissioner to deny Cahill disability insurance benefits. An appropriate order follows.